**McNEILAB, INC., Plaintiff,**

v.

**AMERICAN HOME PRODUCTS CORPORATION, Defendant.**

**No. 79 Civ. 3973.**

United States District Court,
S. D. New York.

July 18, 1980.

As Amended Nov. 21, 1980.

518

Patterson, Belknap, Webb & Tyler, New York City, Arnold & Porter, Washington, D. C., Townley & Updike, New York City, for plaintiff; David F. Dobbins, Karl E. Seib, Jr., Gene M. Bauer, New York City, Peter K. Bleakley, William W. Vodra, Maxwell J. Mehlman, John M. Quinn, Vicki J. Divoll, Hamish R. Sandison, Washington, D. C., John Paul Reiner, Mark D. Geraghty, New York City, of counsel.

Charles F. Hagan, William P. Woods, New York City, for defendant.

LASKER, District Judge.

In June, 1979, American Home Products Corporation ("AHP"), the manufacturer of the non–prescription internal analgesic Anacin, began a nationwide advertising campaign for a new analgesic preparation, Maximum Strength Anacin ("MSA"). In this action, McNeilab, Inc. ("McNeil"), the manufacturer of the competing non–prescription internal analgesic Extra Strength Tylenol, seeks an injunction barring AHP from making three advertising claims in its efforts to promote MSA. McNeil contends that these advertising claims violate section 43(a) of the Lanham Trade–Mark Act of 1946,[1] 15 U.S.C. § 1125(a), which provides that

> "[a]ny person who shall ... use in connection with any goods or services ... any false description or representation, including words or other symbols tending falsely to describe or represent the same ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of such false description or representation,"

1. Ch. 540, 60 Stat. 427 (1946), as amended (codified at 15 U.S.C. §§ 1051, 1051 note, 1052– 1096, 1111–1121, 1123, 1127).

and that AHP's use of false or misleading advertising claims constitutes unfair competition under the common law.

In particular, McNeil contends that various advertisements for MSA "tend falsely to describe or represent" MSA because 1) consumers perceive them as making a claim that MSA is a "stronger" analgesic than Extra Strength Tylenol, which it is not, 2) the assertion that MSA "contains the maximum strength allowed without prescription" is false, and 3) the use of the phrase "the pain reliever doctors recommend most" is misleading.

The hearing on McNeil's motion for a preliminary injunction and the trial on the merits were consolidated pursuant to Rule 65(a)(2), Fed.R.Civ.P. At the time, only the first of McNeil's three claims was before the court, but shortly after the conclusion of the trial McNeil filed a written motion to amend the complaint to conform to the evidence, which, it contends, establishes its right to relief on its third claim, see Fed.R. Civ.P. 15(b), and to add its second claim. Concurrently, McNeil sought summary judgment on its second claim which was not addressed at trial. The court has jurisdiction over McNeil's statutory claims by virtue of 15 U.S.C. § 1121, and has pendent jurisdiction over McNeil's parallel common law claims. This opinion constitutes the court's findings of fact and conclusions of law, as well as its disposition of McNeil's motion to amend the complaint and for summary judgment.

### I.

The two most popular non–prescription pain relieving ingredients are aspirin and acetaminophen. AHP does not here contest McNeil's assertion that the two ingredients are equally potent pain relievers. See *American Home Products Corp. v. Johnson & Johnson*, 436 F.Supp. 785 (S.D.N.Y.1977), *aff'd*, 577 F.2d 160 (2d Cir. 1978). The standard dose for both aspirin and acetaminophen is and has long been two tablets containing 325 milligrams ("mg") of active ingredient each, but products containing more than 325 mg per tablet are available without prescription. Products containing 325 mg of pain relieving ingredient are considered "regular strength" products; those containing more are termed "extra strength" or "added strength" products.

Of the various brands of over–the–counter ("OTC") internal analgesics available, the best selling–with a 16% share of dollar sales in the period ending June 30, 1979–is McNeil's Extra Strength Tylenol, which contains 500 mg acetaminophen per tablet or capsule. AHP's Anacin, which contains 400 mg of aspirin per tablet, is the second best seller, with 11% of dollar sales in the same period. The other major sellers, regular Tylenol (325 mg acetaminophen), Bayer (325 mg aspirin), Bufferin (325 mg aspirin) and Excedrin (421 mg combined aspirin, acetaminophen, and salicymide), accounted for between 7% and 9% of dollar sales each. Finally, AHP markets a 500 milligram acetaminophen product, Anacin–3, which captured less than one percent of dollar sales in that period.

In April, 1979, AHP introduced its new product, Maximum Strength Anacin, which contains 500 mg of aspirin. Shortly thereafter, AHP began a nationwide advertising campaign to promote MSA, and between late June and late July AHP ran two advertisements on national television that triggered this lawsuit.

The first of these, known as "Laser," had the following text:

> "This is the age of modern medicine. The age of the laser beam, and the age of a new Maximum Strength Pain reliever.
>
> Maximum Strength Anacin. Maximum Strength allowed without prescription.
>
> Maximum Strength Anacin contains more of the pain reliever doctors recommend most. More than regular strength. More than extra strength. Maximum Strength. The Maximum Strength allowed.
>
> Get new Maximum Strength Anacin. Maximum Strength allowed without prescription." (Plaintiff's Exhibit 1.)

The second, known as "Report," stated:

> "Announcing new Maximum Strength Anacin.

This report of medical experts establishes the maximum single dosage for a pain reliever. Not everyone needs this maximum strength. But for those who do, New Maximum Strength Anacin is here, in the pain reliever doctors most recommend.

Maximum Strength Anacin goes beyond regular strength. Beyond extra strength to Maximum strength.

Get Maximum Strength Anacin. Maximum strength allowed without prescription." (Plaintiff's Exhibit 2.)

AHP subsequently revised the "Report" commercial, in part in response to this litigation, by substituting the phrase "added strength" for the phrase "extra strength." (Defendant's Exhibit N.)

A third advertisement, known as "Circles," was introduced after McNeil instituted this action. It's text was:

"Different people–different pain. Some only need regular strength tablets. Some may need added strength. But some may need Maximum Strength.

Introducing new Maximum Strength Anacin.

Contains more pain reliever. More than regular strength tablets. Even more than added strength. Maximum Strength–two tablets–a full 1000 milligrams.

Next time, get Maximum Strength Anacin for you who need maximum strength." (Defendant's Exhibit O.)

The visual component of each of these advertisements included a graphic representation of the comparative amount of pain reliever in "regular strength products," "extra strength products," and Maximum Strength Anacin. In "Laser" and "Report," this took the form of a bar graph displayed during the third paragraph of the texts quoted above, made up of three bars of increasing height, labeled "regular strength," "extra strength" (or "added strength" in the revised version of "Report"), and Maximum Strength Anacin.[2] In "Circles," this took the form of three circles of increasing diameter, labeled "regular strength," "added strength," and Maximum Strength Anacin, again displayed during the third paragraph of the text as quoted above.[3]

McNeil has three objections to these advertisements. McNeil charges, first, that AHP

"by use of graphical and audio representations of the amount of pain reliever contained in 'regular strength tablets,' 'extra strength products,' and Maximum Strength Anacin, falsely claims that Maximum Strength Anacin contains more 'pain reliever' and provides more pain relief than Extra Strength Tylenol" (Complaint ¶ 17, Proposed Amended Complaint ¶ 17).

Second, McNeil contends that

"AHP's claim in its advertising that 'this report of medical experts . . . establishes' that Maximum Strength Anacin, as currently labeled, contains the 'maximum strength allowed without prescription' is false" (Proposed Amended Complaint ¶ 22);

and that

"AHP's claim in its advertising that Maximum Strength Anacin, as currently labelled, contains the maximum OTC two tablet dosage permitted under law [is false]" (Proposed Amended Complaint ¶ 23).

Third, McNeil argues that AHP's

"use of the phrase 'the pain reliever doctors recommend most' [instead of the true name of that ingredient, 'aspirin'] in connection with the claim that MSA goes beyond extra strength or added strength products in the amount of pain reliever it contains tends to mislead, confuse and deceive consumers . . . by leading them to believe that Maximum Strength Anacin (i) is the brand of pain reliever most recommended by doctors, and/or (ii) does not [contain] aspirin, and/or (iii) [con-

2. See Appendix A.*

***Editors Note**: The copy available cannot be reproduced.

3. See Appendix B.*

tains] more of the pain relieving ingredient contained in Extra Strength Tylenol, [and also, (iv), by failing to inform consumers] that the active ingredient of Maximum Strength Anacin is aspirin" (Proposed Amended Complaint ¶ 25).

McNeil prays for an order enjoining AHP from publishing or using any advertisement calculated to deceive the purchasing public into believing that MSA contains more pain relieving ingredient than any OTC analgesic product that contains 500 mg. of acetaminophen (Proposed Amended Complaint ¶ B), or that MSA, as currently labelled, contains the "maximum amount allowed without prescription" (Proposed Amended Complaint ¶ C). Finally, McNeil seeks an injunction barring AHP from representing in comparative advertising that MSA "goes beyond extra strength, added strength, or adult strength pain relievers" in the amount of analgesic ingredient it contains, without explicitly disclosing that its active ingredient is aspirin (Proposed Amended Complaint ¶ D).

## II.

Shortly before the trial of this action commenced, AHP moved to dismiss the case as moot because it had discontinued broadcasting the "Laser" and "Report" commercials and did not intend to resume airing them. AHP had replaced these two commercials with its revised "Report" and "Circles" commercials, which use the term "added strength" rather than the term "extra strength," and do not use the phrase "the pain reliever doctors recommend most." AHP submitted an affidavit dated September 7, 1979, from John R. Stafford, Senior Vice President of AHP, in which he states that

> "AHP will not in the future use the words 'extra strength' in any comparative advertising for Maximum Strength Anacin unless the 'extra strength' product being compared with Maximum Strength Anacin is identified by brand name or is coupled with the words 'aspirin products.'"

To the extent that McNeil's proposed amended complaint charges that the revised "Report" and "Circles" commercials are themselves misleading, and to the extent that McNeil seeks, in its motion for summary judgment, to challenge the validity of AHP's advertising claim that MSA contains the "maximum allowed" amount of pain reliever, the case is not moot. We conclude, moreover, that it would be inappropriate now to dismiss the claim initially asserted as moot.

Before a suit for injunctive relief can be dismissed as moot, the offending conduct must have ceased and the court must find that there is no reasonable expectation that it will resume. *Allee v. Medrano,* 416 U.S. 802, 810–11, 94 S.Ct. 2191, 2197–2198, 40 L.Ed.2d 566 (1974); *United States v. Concentrated Phosphate Export Association,* 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968); *see United States v. Trans–Missouri Freight Association,* 166 U.S. 290, 307–10, 17 S.Ct. 540, 546–547, 41 L.Ed. 1007 (1897). We do not find that the affidavit submitted by AHP is adequate assurance that AHP will not resume the "offending conduct." *See id.* Not only is it doubtful that the affidavit creates an enforceable commitment, but it is so narrowly drawn that in any event AHP would remain free to air advertisements that McNeil might reasonably complain were within the scope of its complaint, which challenges a type of advertising, though its charges are directed against specific advertisements. *See also Richmond Newspapers, Inc. v. Virginia,* —— U.S. ——, ——, 100 S.Ct. 2814, 2820, 65 L.Ed.2d 973 (1980) (opinion of Burger, C. J.) ("if the underlying dispute is capable of repetition, yet evading review, it is not moot." (quoting *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911), which in turn relied on *United States v. Trans–Missouri Freight Association, supra*)); *Moore v. Ogilvie,* 394 U.S. 814, 816, 89 S.Ct. 1493, 1494, 23 L.Ed.2d 1 (1969) (same).

We conclude that the instant case is not moot, and AHP's motion to dismiss is ac-

cordingly denied. We turn now to the merits of McNeil's claims.

### III.

Extra Strength Tylenol contains 500 mg. of acetaminophen, or just as much pain relieving ingredient as MSA, which contains 500 mg. of aspirin. McNeil contends that AHP's advertising for MSA conveys the false impression that MSA contains more pain relieving ingredient than any other OTC analgesic, including Extra Strength Tylenol. McNeil attributes this in part to AHP's use in its commercials of the phrase "the pain reliever doctors recommend most" to identify the active ingredient in MSA, aspirin, an issue addressed subsequently in this opinion, and in part to AHP's description of OTC internal analgesics in the challenged commercials as "regular strength," "extra" or "added strength," and "maximum strength," in those commercials. McNeil's argument in this regard is that consumers exposed to AHP's advertising conclude incorrectly that Extra Strength Tylenol is an "extra strength" product, when in fact it is a "maximum strength" pain reliever like MSA, which necessarily leads them to conclude that Extra Strength Tylenol is not as strong or effective a pain reliever as MSA.

█ McNeil concedes that the comparative claims made in the challenged commercials are literally true. Aspirin, the active ingredient in MSA, is the pain reliever doctors recommend most,[4] and MSA does contain more *aspirin* than any other OTC analgesic.[5] However, their objective truthfulness does not immunize the commercials from scrutiny under the Lanham Act:

> That Section 43(a) of the Lanham Act encompasses more than literal falsehood cannot be questioned. Were it otherwise, clever use of innuendo, indirect intimations, and ambiguous suggestions could shield the advertisement from scrutiny

precisely when protection against such sophisticated deception is most needed. (citations omitted)

*American Home Products Corp. v. Johnson & Johnson,* 577 F.2d 160, 165 (2d Cir. 1978). It does, however, dictate the nature of the proof that must be offered by the plaintiff in order to sustain its claim under the Lanham Act:

> Deceptive advertising or merchandising statements may be judged in various ways. If a statement is actually false, relief can be granted on the court's own findings without reference to the reaction of the buyer or consumer of the product. . . .

> The subject matter here is different. We are dealing not with statements which are literally or grammatically untrue . . . . Rather, we are asked to determine whether a statement acknowledged to be literally true and grammatically correct nevertheless has a tendency to mislead, confuse or deceive. As to such a proposition "the public's reaction to [the] advertisement will be the starting point in any discussion of the likelihood of deception. . . . If an advertisement is designed to impress . . . customers, . . . the reaction of [that] group[s] will be determinative." . . . A court may, of course, construe and parse the language of the advertisement. It may have personal reactions to the defensibility or indefensibility of the deliberately manipulated words. It may conclude that the language is far from candid and would never pass muster under tests otherwise applied—for example, the Securities Acts' injunction that "thou shalt disclose"; but the court's reaction is at best not determinative and at worst irrelevant. The question in such cases is—what does the person to whom the advertisement is addressed find to be the message?

---

4. It is not disputed that doctors recommend aspirin to their patients much more frequently then they recommend acetaminophen. See Defendant's Exhibit P (National Disease and Therapeutic Index (1979)).

5. A 650 mg timed release aspirin–based product is marketed, but because of its timed release characteristic, its actual dosage level is less than that of MSA.

*American Brands, Inc. v. R.J. Reynolds Tobacco Co.*, 413 F.Supp. 1352, 1356–57 (S.D. N.Y.1976) (quoting 1 R. Callman, Unfair Competition, Trademarks and Monopolies § 19.2(a)(1) at 656 (3d ed. 1967)), *quoted in American Home Products Corp. v. Johnson & Johnson, supra,* 577 F.2d at 165–66. Thus, where, as here, the issue is whether true statements are misleading or deceptive despite their truthfulness, it is not enough to place the statements alone before the court. The plaintiff must adduce evidence (usually in the form of market research or consumer surveys) showing how the statements are perceived by those who are exposed to them. This does not mean that the conclusions of market researchers and other expert witnesses are binding on the court. *See American Home Products Corp. v. Johnson & Johnson, supra,* 577 F.2d at 167. Though the court's *own* reaction to the advertisements is not determinative, as finder of fact it is obliged to judge for itself whether the evidence of record establishes that *others* are likely to be misled or confused. In doing so, the court must, of course, rely on its own experience and understanding of human nature in drawing reasonable inferences about the reactions of consumers to the challenged advertising.

### A.

As proof of its claim that AHP's commercials for MSA tend to confuse or mislead consumers, McNeil relies principally on two marketing research studies that it commissioned to test consumer reactions to those commercials. The first of these was conducted by ASI Market Research, Inc. ("ASI"), at ASI's theatre facilities in Los Angeles, on August 3rd and 4th, 1979. One of the primary objectives of this study, which involved 501 participants, was

> "[t]o determine the extent of delayed recall of the advertiser's name and sales content of the test film."[6]

This study consisted of two components. The first, standard, component, was designed to test viewers' "unaided" recall of the test commercial's content. The second, "refocus," component, was designed specifically to determine whether the commercial communicated that MSA is a "stronger" pain reliever than other brands.

During the standard component of the ASI study, the participants were shown a series of new television programs and commercials, one of which was AHP's "Report" commercial. About an hour after they were shown the commercials, the viewers were asked to list the products or services advertised, the names of the advertisers, and everything they could remember about what was said or shown in the commercials. ASI then tabulated the viewers written responses based on the sorts of claims the viewers recalled the commercials as making. According to ASI's tabulations, 23% of the audience (17% of the Extra Strength Tylenol users in the audience) characterized the commercial as making a claim of competitive superiority.[7] Mark Pinney, Executive Vice President of ASI, testified that an "unaided recall" response rate of 7 to 10% establishes that a particular message is communicated to a substantial number of viewers.

After the standard component of the ASI study was concluded, the "refocus" component was begun. Those participating in the study were shown the "Report" commercial a second time, and then asked to complete a questionnaire. On the questionnaire, they indicated which brand of pain reliever they most often use, and responded to two substantive questions:

> "From what you have seen or heard in the commercial, do you think that they were attempting to compare Maximum Strength Anacin to the brand of pain reliever you, yourself, use most often?"

and

> "*Based only on what the commercial said,* would Maximum Strength Anacin contain more pain reliever, the same amount of pain reliever, or less pain reliever than the brand you, yourself, currently use most often?" (Emphasis in original.)

---

**6.** Plaintiff's Exhibit 330 at ii.

**7.** *Id.* at 4.

Sixty–three percent of the 93 Extra Strength Tylenol users participating in the study answered the first question affirmatively. Only 49% of the Excedrin users and 51% of the Anacin users did so, probably indicating that the false claim of MSA's analgesic superiority to Extra Strength Tylenol was more effectively communicated than the true claim of MSA's analgesic superiority to Excedrin and regular Anacin. Moreover, 67% of the Extra Strength Tylenol users concluded, "based only on what the commercial said," that MSA contains more pain reliever than Extra Strength Tylenol.

The second study commissioned by McNeil, which was conducted by Burke Marketing Research, Inc. ("Burke"), consisted of a survey of 295 Extra Strength Tylenol users who were shown the "Laser" commercial in shopping centers in Denver, Pittsburgh, and Louisville, Kentucky, in late July, 1979. The study was designed

> "to evaluate the introductory 'Maximum Strength Anacin' commercial in terms of its meaning as perceived by analgesic users whose usual brand · is Extra Strength Tylenol.
>
> Specifically, it was designed to measure:
>
> (1) the level of perception of comparative references to Extra Strength Tylenol, and
>
> (2) the specific content of those inferred comparisons." [8]

In each shopping mall, trained Burke interviewers approached shoppers and asked them a series of screening questions. To identify Extra Strength Tylenol users, the interviewers showed each subject a photograph displaying boxes of the seven most used varieties of OTC analgesic–Bayer, Bufferin, Excedrin, Anacin, regular Tylenol, Extra Strength Tylenol tablets, and Extra Strength Tylenol capsules–and a box marked "other," and asked the shopper to point out the one he or she used most often. The photograph was used to minimize the bias that might result, for instance, if the interviewer were required to pronounce the words "extra strength" to get the informa-

tion sought. Those shoppers who indicated that they did use Extra Strength Tylenol most often were then asked to participate in the study, and offered two silver dollars if they would do so. (They did not know, however, that only Extra Strength Tylenol users were asked to participate.)

Those who agreed to do so were then shown the "Laser" commercial in a private booth. They were next shown a photograph of the bar chart that appeared in the commercial, and asked whether they recalled seeing it. Those who did were asked "What pain relief products do you think the advertiser is referring to in this category?"–indicating the middle bar of the graph, labelled "extra strength." If they answered simply "Tylenol", they were again shown the photograph of the seven leading pain relievers and asked which of the varieties of Tylenol they thought the advertiser was referring to (regular Tylenol, Extra Strength Tylenol tablets, or Extra Strength Tylenol capsules). Finally, those who indicated that they believed Extra Strength Tylenol was among the pain relievers which the middle bar was intended to represent were asked "What, if anything, do you think this commercial is saying about 'Maximum Strength' Anacin as compared to your usual brand" (Extra Strength Tylenol, since the question was asked only of those who had already indicated that that was their usual brand, though again, the participants did not know this)?

Of the 295 Extra Strength Tylenol users who participated in the study, 39.5% indicated that they believed the middle bar of the graph was intended to refer to Extra Strength Tylenol. Of these, 81.7% characterized the commercial as making a claim that MSA is a more potent analgesic than Extra Strength Tylenol. This is not surprising, since to anyone who related the middle bar to Extra Strength Tylenol the fact that the commercial makes such a claim seems obvious.

To rebut the implications of these studies, AHP called Professor Benjamin Lipstein,

---

**8.** Plaintiff's Exhibit 320 at 1.

an expert in the field of consumer research and marketing. He testified that although the procedures used in the standard component of the ASI study were proper, the conclusions drawn by McNeil from the results of that study were incorrect. He further testified that the Burke study and the "refocus" component of the ASI study were not properly conducted and the results of those studies were invalid.

As noted, Professor Lipstein testified that the standard component of the ASI study was methodologically correct, but he disputed McNeil's contention that the study established that the "Report" commercial was misleading. We do not find his criticisms persuasive. He stated first that the study demonstrated that the commercial was "terribly poor",[9] something that McNeil does not dispute and that is irrelevant to the issues before the court. Second, he testified that he had personally reviewed the verbatim responses of the participants in the study, and concluded that ASI had inaccurately tabulated those responses. A proper tabulation, he suggested would indicate that a much smaller portion of the viewers perceived the commercial as making a claim of analgesic superiority to other brands, including Extra Strength Tylenol, than the 23% figure provided by ASI.[10] We believe that here, as elsewhere, Professor Lipstein's criticism misses the point, which is not whether the study provides accurate quantitative evidence of the proportion of the population that is misled, but whether it indicates that the challenged commercial "*tends* to confuse or mislead." We have reviewed the verbatim responses ourselves, and though it is true that none of the respondents recalled the commercial as expressly claiming that MSA is stronger than Extra Strength Tylenol, enough of their verbatim responses reflect a perceived undifferentiated claim of analgesic superiority to establish that the commercial does have a tendency to mislead. We find that the standard component of the ASI study,

which AHP admits was validly conducted, provides ample support for McNeil's allegation that the "Report" commercial violates section 43(a) of the Lanham Act.

With respect to the refocus component of the ASI study, and the Burke study, Professor Lipstein did not dispute that those studies, if credited, establish that consumers perceive the "Report" and "Laser" commercials as making a claim that MSA is "stronger" than Extra Strength Tylenol. Here, however, he was critical of the methodology employed, and testified that the studies were invalid and their results unuseable.[11]

Professor Lipstein objected to the refocus component of the ASI study for two reasons. First, he argued that it was improper to show the test commercial a second time at the beginning of the refocus segment of the study, because this heightened the viewer's attention: "You are getting an unusual kind of concentration and focus on that commercial, which is obviously not anything like the real world.[12] Once again, we believe Professor Lipstein's criticism is beside the point. He objects, in essence because the methodology of the refocus study causes the participants to pay closer attention to the commercial than they would in their living rooms. This, however, is no indication that they are more likely to misconstrue the message of the commercial than viewers who see it at home during a station break. Indeed, ASI generally rescreens the test film at the beginning of the refocus segment of its studies (though Professor Lipstein erroneously testified that it did not), because it is seeking not to measure how well the commercial makes its point, but what its point is perceived to be; unlike the standard component, ASI's refocus component is intended to test the impression the commercial makes, not how readily it is recalled later. Test data based "on audience recall rather than immediate impression" suffers from inherent weaknesses,

---

9. Trial Transcript at 653.

10. *Id.* at 657–60.

11. *Id.* at 644–51.

12. *Id.* at 645.

*American Home Products Corp. v. Johnson & Johnson, supra,* 577 F.2d at 167 n.15; we find that the reliability of the ASI refocus study is enhanced rather than diminished by the fact that it tests "immediate impressions" rather than "recall."

Professor Lipstein's second criticism of the refocus component of the ASI study was that the substantive questions posed to the participants were "biased, misleading, and improper." He argues, for instance, that in requiring respondents to answer "yes" or "no" to the first question (Was the commercial "attempting to compare Maximum Strength Anacin to the brand of pain reliever you, yourself, use most often?"), the question is "clearly directing towards a 'yes' answer." In the absence of more artful explanation of the supposed "bias" than Professor Lipstein provided at trial, his argument strains credulity.

In our view, Professor Lipstein's critique of the ASI refocus component fails to cast serious doubt on the validity of the results of that study.

■ We are similarly unconvinced by Professor Lipstein's critique of the Burke study. His principal criticism was that the study did not conform to "accepted research design principles," since it was neither based on a "projectible" sample nor arranged as an "experimental design." Once again, his criticism would be well taken if the question before the court required some sort of quantitative determination of the extent to which consumers are misled by AHP's advertising. But a qualitative rather than a quantitative determination is enough to support a conclusion that an advertisement *"tends"* to mislead, if the qualitative showing establishes that a not insubstantial number of consumers receive a false or misleading impression from it. In this regard, it is particularly significant that, as the record establishes, a host of manufacturers of consumer products, AHP among them, rely heavily on tests conducted by Burke–tests that suffer from just the defects that Professor Lipstein finds so damning–in determining how to allocate millions of advertising dollars. This alone suggests that whatever their design defects, properly conducted Burke studies are entitled to considerable weight in determining whether advertising is misleading.

In addition to his general criticism of the Burke study's design, Professor Lipstein voiced a number of objections to particular elements of the study. First, he suggested that the photograph of the seven leading pain relievers used during the study to get specific information regarding the analgesic preparation used most often by each respondent and the preparations that each respondent believed were represented by the middle bar of the bar graph was "suggestive" because three of the seven products shown were Tylenol products. The use of this photograph, he testified, predisposed respondents to give Tylenol and Extra Strength Tylenol responses to later questions in the interview. While this may be so, no other method of eliciting the information sought would be any less suggestive. Second, Professor Lipstein testified that it was improper to isolate the bar chart from the commercial and ask specific questions about it. This, he said, tested reactions to the bar chart rather than reactions to the whole commercial. However, insofar as the bar chart was a key visual element of the commercial, especially with respect to the comparative claims made, we doubt that such a feature causes the study to be an unreliable guide to consumer reactions to the whole commercial. Finally, Professor Lipstein argued that when an Extra Strength Tylenol user who had identified the middle bar of the chart as representing Extra Strength Tylenol was asked what he or she thought the commercial said about MSA as compared to his or her own brand, the respondent was bound to answer that the commercial said that MSA was stronger. This is undoubtedly true, but if it proves anything it is that the commercial, not the Burke study, is defective.

In addition to Professor Lipstein's testimony regarding the consumer studies commissioned by McNeil, AHP offers the results of studies it commissioned as evidence that its commercials are not misleading.

(Defendant's Exhibits Y and Z.) These studies were "day after recall" surveys also performed by Burke. In these surveys, Burke employees conducted telephone interviews of individuals who had recently watched television programs during which the "Laser" and "Report" commercials were aired, and recorded their responses verbatim. Professor Lipstein reviewed those responses, and testified that none of them contained specific statements to the effect that the commercials tested make a "superior strength claim for Maximum Strength Anacin over Extra Strength Tylenol." [13] His testimony, however, is rebutted by the verbatim responses themselves, which include statements such as: "I believe that it [the "Report" commercial] said that it [MSA] works faster and relieves more than any other brand"; "It had more power and more medicine to stop your headache than any other"; and "Anacin is stronger than other brands." [14] Admittedly, these examples are perhaps the most forceful ones supporting McNeil's claim, but they demonstrate that, at the least, reasonable men could draw conclusions differing from Professor Lipstein's. More importantly, our own review of the verbatim responses suggests that to the extent they have any probative value here at all, which is doubtful, since it appears that those interviewed in fact often remembered a commercial other than the test commercial they were supposedly discussing, see *American Home Products Corp. v. Johnson & Johnson*, 436 F.Supp. 785, 793–94 (S.D.N.Y.1977), *aff'd*, 577 F.2d 160 (2d Cir. 1978) (reporting similar findings with a similar day after recall survey), they certainly do not support AHP's claim that its commercials are not misleading, though neither do they support McNeil's claim to the contrary.

In sum, we find that the evidence of consumer perception of the "Report" and "Laser" commercials fully supports McNeil's contention that those commercials tend "falsely to describe or represent" MSA, by suggesting that it is a more pow-erful analgesic than Extra Strength Tylenol, which it is not.

### B.

McNeil asserts not only that the challenged commercials mislead consumers, but that AHP intended them to do so. Although intent is not an element of a cause of action under section 43(a) of the Lanham Act, McNeil argues that evidence of AHP's intent is relevant because proof that an advertiser set out to communicate a particular message is itself evidence that the intended message was communicated.

Although we are aware of no cases which discuss the role of intent in false advertising cases such as this one, its role in trade dress cases under section 43(a) is well established. *See Harold F. Ritchie, Inc. v. Cheesebrough Ponds, Inc.*, 281 F.2d 755, 760 (2d Cir. 1960); *Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538, 543 (1956); *Combe, Inc. v. Scholl, Inc.*, 453 F.Supp. 961, 964 (S.D.N.Y.1978). In such cases, as in false advertising cases, it is not necessary to prove that the defendant intended to confuse or mislead the purchasing public. Nonetheless, if the plaintiff shows that the defendant deliberately imitated the plaintiff's trade dress, the plaintiff need not prove actual consumer confusion:

> Once the intent to cause confusion is established, the Court will presume that the infringer accomplished his purpose. The presumption is supported on the theory that the infringer, as an expert in the market he has chosen to enter, is correct in his assessment that public confusion will result.

*Polo Fashions, Inc. v. Extra Special Products, Inc.*, 451 F.Supp. 555, 562 (S.D.N.Y. 1978); *accord, Maternally Yours, Inc. v. Your Maternity Shop, Inc., supra*, 234 F.2d at 543 n.3 ("Evidence of the alleged infringer's intent to cause confusion, though not essential to a trade–mark or unfair competition action is relevant as an opinion by one familiar with market conditions, the alleged

---

**13.** *Id.* at 668.

**14.** Defendant's Exhibit Z, Table 4 at 3, 5.

**530**

infringer himself, that there is likelihood of confusion."). We conclude that similarly, in a false advertising case such as this one, proof that the advertiser intended to communicate a false or misleading claim is evidence that that claim was communicated, since it must be assumed that more often than not advertisements successfully project the messages they are intended to project, especially when they are professionally designed, as the ones involved here were.

After reviewing the evidence, we find that although AHP may not have set out deliberately to develop a misleading advertising campaign for MSA, the strategy it adopted as the basis for its campaign created a substantial risk of misleading the public, a risk that was called to AHP's attention on several occasions. Nonetheless, AHP did nothing to ensure that the misleading potential of its strategy did not materialize.

Much of the evidence on which McNeil relies shows only that AHP recognized that Extra Strength Tylenol was its principal competitor in the OTC internal analgesics market, and that one of AHP's chief reasons for marketing a new product, MSA, was to compete "head on" with Extra Strength Tylenol. This, however, is not evidence that AHP intended to compete with Extra Strength Tylenol by making deliberately false claims of MSA's analgesic superiority to Extra Strength Tylenol.

But from the beginning, AHP planned to promote MSA as a product occupying a "unique" niche in the market. Thus, in November, 1978, when the top executives of Whitehall Laboratories, the division of AHP that manufactures and markets OTC drugs, first sought approval from AHP's president and chairman of the board for the introduction of MSA, one of the rationales they gave for the introduction of the new product was:

"Strongest Non–Prescription Product–No Product Like It." [15]

15. Plaintiff's Exhibit 272 at 10.

16. Trial Transcript at 106–07.

The notion that there is "no product like it" was subsequently incorporated in AHP's communications to the advertising agencies responsible for developing the commercials involved here. Thus, the "copy strategy" for AHP's campaign to introduce MSA— "the single most important piece of direction that a client gives an agency telling them what they want advertising copy to achieve, what that copy is supposed to do to convince consumers" [16] was:

> To introduce to current analgesic users, Anacin's New Maximum Strength Product. Maximum Strength Anacin is unique in that a.) it's the maximum allowable strength available without a prescription. b.) it is contemporary, modern medicine which makes regular and extra strength products outdated and fills today's analgesic user's needs.[17]

But MSA is "unique" *only* in the aspirin–based segment of the OTC internal analgesics market, and any failure clearly to limit the claim that MSA is unique because it is the strongest to that segment of the market results in misleading advertising. Consider the reformulation of the copy strategy by the agency that prepared the "Report" commercial; which does not so limit the claim:

*Copy Strategy*

*TO ANNOUNCE:*

MAXIMUM STRENGTH ANACIN–as the strongest most effective pain reliever available for people with pain.

*AVAILABLE SUPPORT:*

1. Maximum dose.

2. 15 miligrams [sic] of pain reliever–strongest available without prescription.

3. Stronger than Bayer, Bufferin, Regular Tylenol and Extra–Strength Excedrin.[18]

Here MSA is compared to products in both the aspirin and acetaminophen segments of the market; moreover the "available support" is not support for the announcement

17. Plaintiff's Exhibit 87 at 4.

18. Plaintiff's Exhibit 274.

that MSA is "the strongest most effective pain reliever available," because MSA is not in fact "stronger" than Extra Strength Tylenol.

AHP's decision to try to "position" MSA as a "unique" product in the OTC internal analgesics market involved a risk that the resulting commercials would be misleading. Whitehall's medical director apparently recognized this. When she saw the "copy strategy" for MSA, she sent Whitehall's vice–president for new products a memo in which she asked "May we please discuss the copy claim 'makes regular and extra strength products outdated' . . . and the claim that the product is 'unique' 'because it's the maximum allowable strength available without a prescription.' " [19] Her memo was not answered. When the "Report" commercial was submitted to the major networks for review, ABC's Department of Broadcast Standards and Practices objected to it as follows:

> The comparison set forth in frames five through seven is highly misleading in that it offers the impression that the level of pain reliever contained in Maximum Strength Saloxium [a code name for MSA] exceeds levels found in the general category of extra strength pain relievers. In view of the fact that the various extra strength products exist containing the same 500 mg (per tablet) level as Saloxium we feel the approach is highly questionable. The copy in frame eight which reads, "in the pain reliever doctors recommend most" is not sufficient to offset this misleading implication.[20]

Accordingly, it is clear that AHP had reason to be aware of the "highly questionable" nature of its approach to advertising

MSA. Nonetheless, it did not take steps to ensure that its advertising would not confuse consumers. Its failure to do so is particularly egregious in view of the "initial decision" entered a few months earlier by an Administrative Law Judge in a proceeding before the Federal Trade Commission. The ALJ addressed claims that AHP's advertising for regular Anacin was misleading in a detailed 228 page opinion. The accompanying order enjoined AHP from,

> in connection with the labeling, advertising, offering for sale, sale or distribution of "Anacin," "Arthritis Pain Formula," *or any other non--prescription internal analgesic product,* . . . [r]epresenting, directly or by implication . . . [t]hat such product contains more of any ingredient than any other non–prescription internal analgesic product or products, or otherwise making a quantitative comparison with any other product or products, unless:
>
> a. The ingredient is named by its common, or usual name;
>
> b. The product, or products, used for comparison is, or are, named;
>
> c. The ingredient is present in greater amount in such preparation than in the product, or products, used for comparison.

*In re American Home Products Corp.,* No. 8918 (FTC, Initial Decision filed September 1, 1978) (Hyun, J.) (emphasis added). In view of this order, it is disturbing that AHP was not more sensitive to intimations that its commercials were misleading, especially since those intimations dealt with commercials that failed to conform to the provisions of the order.[21] Since those commercials have a bearing on matters of public health, AHP's insensitivity was irresponsible.[22]

---

**19.** Plaintiff's Exhibit 92.

**20.** Plaintiff's Exhibit 124.

**21.** In a Federal Trade Commission adjudicative proceeding, the hearing officer must file an "initial decision" and "an appropriate rule or order" within 90 days of the completion of the hearing, or within such further time as the Commission may allow. It becomes the decision of the Commission 30 days after it is served on the parties, or 30 days after a notice of appeal is filed, if the appeal is not perfected.

16 C.F.R. § 3.51 (1980). We are not aware of the current status of the FTC proceeding against AHP; we assume that at the time the commercials involved here were broadcast, the order accompanying the Initial Decision was not in effect.

**22.** Although aspirin is a widely used drug, its use is not entirely hazard free. Aspirin use may potentiate peptic ulcer, cause stomach distress or heartburn, cause an increase in occult bleeding and, in some persons, massive gastrointestinal bleeding. Its use should be avoid-

We conclude, then, that AHP set out to advertise MSA as a "unique" product even though it had acquired reason to believe that this would be misleading, and that the instructions it gave to the agencies that prepared the commercials involved here suggested advertising claims that were at best ambiguous.

### C.

The preceding discussion focused on the "Report" and "Laser" commercials. McNeil also challenges AHP's revised "Report" and "Circles" commercials which are similar to the first two except that the term "added strength" is substituted for the term "extra strength." McNeil has presented no evidence of consumer reactions to these commercials, but argues that their meaning is unaffected by the substitution of "added strength" for "extra strength", and that accordingly it is entitled to the same relief with respect to these commercials as it is with respect to the two that originally prompted this lawsuit.

We agree that the change in terminology does not alter the *literal* meaning of the commercials. That does not mean, however, that their message as perceived by viewers is unchanged. In particular, it seems clear that consumers are more likely to assume that Extra Strength Tylenol belongs to the category or "extra strength" products than that it belongs to the category of "added strength" (or "adult strength") products, simply because of the greater similarity of the language used. This is not to say that we conclude that the revised "Report" and "Circles" commercials are not misleading, but only that the record as it stands is inadequate to support such a conclusion.

### D.

As one aspect of its motion to amend the pleadings to conform to the proof at trial,

McNeil contends that the evidence adduced proves that AHP's use of the phrase "the pain reliever doctors recommend most" in its advertising is misleading, because it suggests that MSA is the brand of pain reliever that doctors recommend most, that MSA does not contain aspirin, and that it contains the same pain relieving ingredients as Extra Strength Tylenol. Again, it may be that McNeil's contentions are accurate, but the record in this case is insufficient to prove it. We have reviewed the evidence which McNeil relies on, especially the verbatim responses recorded in the course of various studies performed by Burke and ASI. By McNeil's own count only 4 of 104 responses in the study Burke did for it and only 12 of 501 responses in the ASI study suggest that the accused phrase communicates a false or misleading message, and we find many of those responses somewhat ambiguous. Though a greater percentage of responses recorded in the course of day–after–recall tests performed for AHP are indicative of confusion, the record as a whole, on this issue, is simply too thin to support a resolution of McNeil's claims.

McNeil also charges that the phrase "the pain reliever doctors recommend most" does not inform analgesics users that "the active ingredient of Maximum Strength Anacin is aspirin, which can have a variety of undesirable side effects at OTC dosage level and should not be taken by many consumers." Complaint ¶ 25. However, a failure to inform consumers of something, even something that they should know, is not *per se* a misrepresentation actionable under section 43(a) of the Lanham Act.

In sum, the proof to which McNeil seeks to conform the pleadings had not been presented. Accordingly, McNeil's motion to amend its complaint to add claims relating to the phrase "the pain reliever doctors recommend most" is denied.

---

ed by persons with severe anemia, blood coagulating defects, or taking anti–coagulant or anti-diabetic drugs, hypersensitive individuals, especially certain asthmatics, and pregnant women. The Report of the Advisory Review Panel on Over–The–Counter Internal Analgesic, Antipyretic and Antirheumatic Products (April 5, 1977), reprinted in 42 Fed.Reg. at 35347–489 (July 8, 1977), discusses the health hazards associated with aspirin use in detail at pages 35383–411.

## IV.

### A.

Each of the commercials of which McNeil complains states in words or substance that MSA "is the maximum strength allowed without prescription." During the trial, McNeil moved to amend its complaint to add a claim that this representation is false. Following the trial it renewed its motion in writing, and supplemented it with a motion for summary judgment on the proposed new claim. AHP contests McNeil's legal analysis of the issue, asserts that the existence of material questions of fact precludes summary judgment, and therefore opposes McNeil's motion to amend the complaint as untimely because it will require further trial. We conclude that summary judgment is appropriate because the questions of fact raised by AHP are not material, that as a matter of law the assertion that MSA "is the maximum strength allowed" is false, and consequently, that granting McNeil's belated motion to amend its complaint will not prejudice AHP. Accordingly, that motion and McNeil's motion for summary judgment are granted.

The representation that MSA is the maximum strength "allowed" implies that an appropriate authority has authorized the sale of MSA or products like MSA. That authority is the Food and Drug Administration ("FDA"), and the principal question here is whether the sale of MSA is authorized under "rush–to–market" regulations promulgated by the FDA. Before addressing this question, it is necessary to review the events and circumstances that generated the regulations at issue.[23]

The Federal Food, Drug, and Cosmetic Act of 1938, 21 U.S.C. §§ 301–392 (1976), provides that no "new drug" can be marketed unless the FDA first approves a "new drug application" ("NDA") with respect to that drug. To obtain such approval under the Act as originally enacted, ch. 675, 52 Stat. 1052 (1938), the applicant had to establish that the drug was safe for use under the recommended conditions. However, FDA preclearance was not required for a drug that was not a "new drug," that is, under the original act, for a drug generally recognized by experts as safe for its recommended use.

In 1962, Congress amended the Act. Drug Amendments of 1962, Pub.L.No. 87–781, 76 Stat. 780. As amended, the Act provides that an NDA can be approved only if the FDA finds the drug to be not only safe, but effective and not misbranded. 21 U.S.C. § 355(d). Approved NDAs effective at the time of the 1962 amendment were deemed approved, but the FDA was to review them and *withdraw* approval if it found no substantial evidence of effectiveness. Drug Amendments of 1962, § 107(c), 21 U.S.C. § 321 note (1976). In addition, Congress modified the definition of a "new drug" to include any drug whose composition is not

> generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof.

21 U.S.C. § 321(p)(1). As a result, in addition to reviewing pre–existing NDAs to determine whether approval should be withdrawn, the FDA was faced with the monumental task of evaluating all drugs marketed without NDAs to determine whether they are "generally recognized as safe and effective." Rather than undertake this task on a case by case basis, the FDA undertook an OTC Drug Review to determine conditions for the recognition of drugs as safe, effective, and not misbranded. *See* 21 C.F.R. §§ 330.1–.13. In the Review, the 300 to 500 significant active ingredients

---

**23.** Our account is adopted in large part from Judge Sirica's detailed discussion in *Cutler v. Kennedy,* 475 F.Supp. 838, 840–45 (D.D.C. 1979). See also *Weinberger v. Hynson, Westcott and Dunning, Inc.,* 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973); *CIBA Corp. v. Weinberger,* 412 U.S. 640, 93 S.Ct. 2495, 37 L.Ed.2d 230 (1973); *Weinberger v. Bentex Pharmaceutical, Inc.,* 412 U.S. 645, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973); and *USV Pharmaceutical Corp. v. Weinberger,* 412 U.S. 655, 93 S.Ct. 2498, 37 L.Ed.2d 244 (1973).

found in the 300,000 to 500,000 OTC drug products on the market were classified into therapeutic categories, such as ant–acids, laxatives, cold remedies, and internal analgesics. Advisory review panels made up of qualified experts were formed to review the active ingredients within each category, 21 C.F.R. § 330.10(a)(1), and general safety, effectiveness, and labeling standards to be applied by the panels were developed, *id.* § 330.10(a)(4).

The OTC Drug Review is currently in progress. As each panel concludes its study, it prepares a report to the FDA containing its conclusions and recommendations "with respect to the conditions under which OTC drugs falling within the category covered by the panel are generally recognized as safe and effective and not misbranded." The regulations provide that the report shall include:

(i) A recommended monograph or monographs covering the category of OTC drugs and establishing conditions under which the drugs involved are generally recognized as safe and effective and not misbranded (Category I). This monograph may include any conditions relating to active ingredients, labeling indications, warnings and adequate directions for use, prescription or OTC status, and any other conditions necessary and appropriate for the safety and effectiveness of drugs covered by the monograph.

(ii) A statement of all active ingredients, labeling claims or other statements, or other conditions reviewed and excluded from the monograph on the basis of the panel's determination that they would result in the drug's not being recognized as safe and effective or result in misbranding (Category II).

(iii) A statement of all active ingredients, labeling claims or other statements, or conditions reviewed and excluded from the monograph on the basis of the panel's determination that the available data are insufficient to classify such condition under either paragraph (a)(5)(i) or (ii) of this section and for which further testing is therefore required (Category III) . . . .

21 C.F.R. § 330.10(a)(5). After reviewing the advisory review panel's report, the Commissioner of Food and Drugs publishes a proposed order (also referred to as the "proposed monograph") that is to contain:

(i) A monograph or monographs establishing conditions under which a category of OTC drugs is generally recognized as safe and effective and not misbranded (Category I).

(ii) A statement of the conditions excluded from the monograph on the basis of the Commissioner's determination that they would result in the drug's not being generally recognized as safe and effective or would result in misbranding (Category II).

(iii) A statement of the conditions excluded from the monograph on the basis of the Commissioner's determination that the available data are insufficient to classify such conditions under either paragraph (a)(6)(i) or (ii) of this section (Category III).

(iv) The full report(s) of the [advisory review] panel to the Commissioner.

*Id.* § 330.10(a)(6). After receiving and reviewing comments on the proposed order the Commissioner publishes a "tentative final monograph," *id.* § 330.10(a)(7), and, following additional comments, a "final monograph," definitively establishing the conditions under which drug products not covered by an approved NDA (including most OTC products) will be deemed "generally recognized as safe and effective and not misbranded," *id.* § 330.10(a)(9), and therefore exempt from the pre-marketing clearance requirement of the Food, Drug and Cosmetic Act, *see* 21 U.S.C. §§ 321(p), 355.

The Advisory Review Panel on OTC Internal Analgesic, Antipyretic and Antirheumatic Products (the "Internal Analgesics Panel," or "IAP") submitted its report to the Commissioner on April 5, 1977, and a few months later the Commissioner published the required proposed monograph, including the full text of the IAP's report, in the Federal Register, 42 Fed.Reg. 35346–489 (July 8, 1977), and proposed rules, *id.* at 35489–94 (to be codified at 21 U.S.C.

§§ 343.1–.80). The Commissioner's proposed monograph adopts, and the proposed rules reflect, the conclusions and recommendations of the IAP. *See id.* at 35346. A tentative final monograph has not yet been published.

In support of its claim that it may legitimately state in its advertising that MSA is "the maximum strength allowed," AHP relies on the following passage from the IAP's report:

> [T]he Panel defines the maximum single dosage as the maximum amount of drug that is safe and effective for use in a 4–hour period. The Panel has established 1,000 mg as the maximum single safe and effective dosage for the standard drugs (aspirin, acetaminophen and sodium salicylate).

42 Fed.Reg. at 35358. However, contrary to what AHP asserts, the "maximum single safe and effective dosage" is not necessarily the same thing as the maximum dosage "allowed." [24] It was the purpose of the IAP to establish the *conditions* under which the use of drug products are "generally recognized as safe and effective and not misbranded." The Panel did establish that no product containing more than 1,000 mg aspirin would be "allowed," but it imposed conditions on products containing lesser dosages, conditions that must be complied with before the marketing of such products will be permitted. As the Commissioner noted in his proposed monograph:

> [m]ajor changes will result in the current marketing practices of these products if the recommendations of the Panel are fully implemented. The Panel's recommendations include many revisions in labeling, particularly limitations of indications for use, and additional warnings against unsafe use. In addition, revised dosage schedules are proposed with major changes in the labeling for prediatric use.

*Id.* at 35346. The central question here is whether AHP can market MSA as "the maximum allowed" without complying with the Panel's labeling recommendations.

24. As noted *infra* at 537 the IAP, despite its conclusion that aspirin in doses of 1000 mg is safe and effective, did *not* recommend

The status of new OTC drug products containing drugs covered by a proposed monograph, prior to the publication of a final monograph, is the subject of the "rush–to–market" regulations involved here, which appear at 21 C.F.R. § 330.13. AHP contends that from the date of publication of the proposed monograph to the effective date of the yet to be published final monograph, it is "allowed," under those regulations, to market MSA as the maximum allowed *without complying with the Panel's labeling recommendations.* McNeil argues to the contrary: that the regulations "allow" the marketing of a new product prior to the publication of a final monograph *only* if that product conforms to the labeling requirements which the IAP considered essential to the safe and effective use of the drug involved.

■ McNeil's position seems the only logical one. It would be nonsensical for the FDA to allow a drug product that, prior to the publication of a proposed monograph, could not be marketed at all, and, after publication of a final monograph, could be marketed only if it complied with that monograph's labeling requirements, to be marketed nevertheless in the interim without complying with any labeling requirement at all. The purpose of the "rush–to–market" regulations is to permit the purveyors of OTC products to market new preparations in reliance on the conclusions contained in a proposed monograph; there is no reason to believe that the FDA intended to permit such marketing except on condition that the restrictions set forth in the monograph be observed. *See* 40 Fed.Reg. 56674 (December 4, 1975).

However, to determine which of the parties offers the correct interpretation of the "rush–to–market" regulations, the court must resolve an apparent inconsistency in the regulations themselves.

Those regulations, promulgated on December 4, 1975, provide in relevant part as follows:

the marketing of any products containing such a dose. Accordingly, AHP's assertion is disingenuous.

(a) Before the publication in the FEDERAL REGISTER of an applicable proposed monograph, an OTC drug product that contains: (1) . . ., or

(2) An active ingredient at a dosage level higher than that available in an OTC drug product on December 4, 1975, shall be regarded as a new drug within the meaning of section 201(p) of the act for which an approved new drug application is required.

(b)(1) An OTC drug product that contains (i) . . ., or

(ii) An active ingredient at a dosage level higher than that available in an OTC drug product on December 4, 1975, which ingredient and/or dosage level is classified by the panel in category I (conditions subject to § 330.10(a)(6)(i)) shall be regarded as a new drug within the meaning of section 201(p) of the act for which an approved new drug application is required if marketed for OTC use prior to the date of publication in the FEDERAL REGISTER of a proposed monograph.

(2) An OTC drug product covered by paragraph (b)(1) of this section which is marketed after the date of publication in the FEDERAL REGISTER of a proposed monograph but prior to the effective date of a final monograph shall be subject to the risk that the Commissioner may not accept the panel's recommendation and may instead adopt a different position that may require relabeling, recall, or other regulatory action. The Commissioner may state such position at any time by notice in the FEDERAL REGISTER, either separately or as part of another document; appropriate regulatory action will commence immediately and will not await publication of a final monograph. Marketing of such a product with a formulation or labeling not in accord with a proposed monograph or tentative final monograph also may result in regulatory action against the product, the marketer, or both.

21 C.F.R. § 330.13(a), (b).

Briefly paraphrased, the regulations provide that, in the absence of an approved NDA, a product that contains more active ingredient than was contained in an OTC product available on the effective date of the regulation cannot be marketed at all prior to the publication of an applicable monograph, but can be marketed after the publication of the proposed monograph (and prior to the publication of a superseding "tentative final monograph" or the final monograph) if its active "ingredient and/or dosage level is classified by the panel in category I," subject to the risk that the Commissioner may at any time reject the recommendations of the panel and institute regulatory action against the product. On this much the parties are agreed; the question, as indicated above, is whether a company that relies on subsection (b)(2) to market a product must comply with the labeling requirements recommended in the IAP's Report, and adopted by the Commissioner, or not.

The question arises because of the apparent inconsistency between the fact that subsection (b)(2) applies only to drug products containing an active ingredient or dosage level classified in "category I," which we believe means a drug product that complies with the formulation and labeling requirements of the proposed monograph, see id. § 330.10(a)(5)(i), (a)(6)(i), quoted above, and the cryptic last sentence of subsection (b)(2), which states that "[m]arketing such a product with a formulation or labeling not in accord with a proposed monograph or tentative final monograph also may result in regulatory action against the product, the marketer, or both."

As AHP points out, one construction of the last sentence is that products may be marketed under the "safe harbor" of subsection (b)(2) without complying with labeling requirements, subject only to possible regulatory action at the Commissioner's discretion. As indicated earlier, we believe this interpretation is unreasonable, and could not have been that intended by the FDA. Moreover, it could be adopted only by concluding that the IAP was to classify ingredients and dosage levels as category I

without regard to any labeling requirements, a conclusion that is irreconcilable with the definition of category I, which indicates that category I consists of those drugs which an advisory review panel (here, the IAP) has found generally recognized as safe and effective and not misbranded *under the conditions established by the panel,* including "any conditions relating to active ingredients, *labeling indications, warnings and adequate directions for use,* prescription or OTC status, and any other conditions *necessary and appropriate for the safety and effectiveness of drugs covered by the monograph.*" *Id.* § 330.10(a)(5)(i) (emphasis added). AHP's proposed conclusion flies in the face of the intent of the OTC Drug Review and the mandate of the IAP, which was to "review OTC drug labeling" and establish "conditions under which OTC drugs are generally recognized as safe and effective *and not misbranded,*" 21 C.F.R. § 330. 10(a)(1) (emphasis added), applying the following standard:

> Labeling shall be clear and truthful in all respects and may not be false or misleading in any particular. It shall state the intended uses and results of the product; adequate directions for proper use; and warning against unsafe use, side effects, and adverse reactions in such terms as to render them likely to be read and understood by the ordinary individual, including individuals of low comprehension, under customary conditions of purchase and use.

*Id.* § 330.10(a)(4)(v). Under the circumstances, we conclude that the language on which AHP relies is intended to indicate only that the Commissioner will exercise his discretion in choosing which drugs that are illegally on the market because they do not comply with the regulations will be subjected to regulatory action; or that it is superfluous.

The question, then, is whether MSA complies with the labeling requirements of the IAP's Report, as adopted by the Commissioner and incorporated in the proposed rules accompanying his monograph. If so, AHP can market MSA under the FDA's "rush–to–market" regulations, and can legitimately claim in its advertising that MSA "is the maximum strength allowed." AHP concedes, however, that MSA is not labeled as required.

The IAP expressed concern about the presence of OTC analgesic products on the market in a wide variety of dosages:

> The Panel believes that the current availability of so many different amounts of aspirin per dosage unit is very confusing to the consumer. It is the opinion of the Panel that this availability has encouraged the myriad of claims such as 'higher levels of pain reliever' or 'arthritis strength' that are currently used. Of even more concern to the Panel is the fact that wide ranges in the amount of aspirin per dosage unit can result in either subtherapeutic or even toxic aspirin blood levels.

42 Fed.Reg. at 35357. As a consequence, the Panel "strongly recommended" that all OTC internal analgesic products "be standardized to contain and labeled to indicate either 325 mg (5 gr) per dosage unit for adults or 80 mg (1.23 gr) per dosage unit for children under 12 years of age." In short, the IAP would outlaw all "extra strength" or "maximum strength" products, and permit sales of "regular strength" and children's strength products only. However, the IAP recognized that the FDA might not be able "to implement the Panel's advice," and in that event would require that

> any product containing more than 325 mg (5 gr) per dosage unit shall be labeled appropriately 'Contains nonstandard strength of X mg (X gr) aspirin per dosage unit compared to the established standard of 325 mg (5 gr) aspirin per dosage unit.'

*Id.* at 35358 & *passim; see id.* at 35494 (proposed regulation to be codified at 21 C.F.R. § 343.50(d)(2)). MSA does not bear this statement *on its label.*

Nor is MSA labeled to comply with the IAP's recommendation in the Report that

> [b]ecause of the many common side effects observed with the use of aspirin ... all products containing aspirin be clearly

labeled as containing aspirin on the principal display panel.

*Id.* at 35359; *see id.* at 35412. This recommendation is not reflected in the proposed regulations, but several of the IAP's specific labeling requirements relating to the safe use of aspirin–based products are. *See id.* at 35383–412 (discussing safety considerations and recommended labeling); *id.* at 35493–94 (proposed regulations to be codified at 21 C.F.R. § 343.50(c)(3), (4)). MSA does not comply with these requirements.

Since MSA is not labeled in conformance with the IAP's Report and the Commissioner's proposed monograph, it does not satisfy the conditions of category I, and consequently is not exempt from the ordinary regulatory scheme embodied in the Food, Drug and Cosmetic Act. However, as an alternative to its principal argument, which we have rejected above, AHP contends that for several reasons MSA may be marketed in conformance with that scheme even if the provisions of the "rush–to–market" regulations do not extend to it. We find these arguments unpersuasive.

AHP first notes that the "rush–to market" regulations apply, by their terms, only to drug products that contain an "active ingredient at a dosage level higher than that available in an OTC drug product on December 4, 1975." AHP refers to this as a "grandfather clause," which it characterizes as "expressly permit[ting] the marketing of new OTC drugs which are equivalent in dosage level to those available on December 4, 1975." Since AHP has submitted evidence that an OTC drug product containing 500 mg of aspirin per tablet was marketed in Puerto Rico between 1967 and 1971, it asserts that its marketing of MSA is "sanctioned" by this supposed grandfather clause.[25]

However, the purpose of this provision on which AHP relies is to *prevent* the marketing, prior to the publication of a proposed

monograph, of drug products containing more active ingredient than was available at the time the "rush–to–market" regulations were promulgated. Thus, that provision does of course permit continued marketing of products legally available at that time, but does not legitimate the continued sale of products that were "available" at that time, but not "allowed" under the provisions of the Food, Drug and Cosmetic Act. It is not enough for AHP to show that 500 mg products were available on December 4, 1975; it must also show that the sale of such products was authorized at that time— that is, that an approved NDA covered the product in question, or that the product was "generally recognized as safe and effective" at that time, and therefore not a "new drug." AHP has attempted no such showing.

AHP next argues that products containing 500 mg aspirin are exempt from regulation under the Food, Drug and Cosmetic Act by virtue of the Act's true "grandfather clause" for drugs marketed prior to its enactment in 1938, and the "grandfather" provision of the Drug Amendments of 1962. However, AHP has offered no proof, and surprisingly, as we read their brief, does not argue, that any specific product containing 500 mg of aspirin was marketed prior to 1938 or prior to 1962. Instead, it relies on the undisputed assertion that "[a]spirin is one of the classic old drugs,"[26] something that can be said of drugs with a provenance considerable more ancient than aspirin's, such as opium, which are nonetheless heavily regulated. Moreover, even if drug products containing 500 mg of aspirin were available prior to 1938 or 1962, to take advantage of the 1962 grandfather clause AHP would have to show that MSA is "intended solely for use under conditions prescribed, recommended or suggested in [the] labeling" of the earlier drug, Drug Amendments of 1962, Pub.L. No. 87–781, § 107(c)(4), 21 U.S.C. § 321 note, and to take

---

25. Defendant American Home Products Corporation's Memorandum in Opposition to McNeilab, Inc.'s Motion for Leave to Serve an Amended Complaint and for Partial Summary Judgment at 36.

26. *Id.* at 41.

advantage of the 1938 grandfather clause, that the earlier drugs "labeling contained the same representations concerning the conditions of its use" as MSA's, 21 U.S.C. § 321(p)(1).

■ We conclude that, despite AHP's arguments, it is not authorized to market MSA as currently labeled, and consequently, that its advertising claim that MSA "is the maximum strength allowed," is false.

### B.

■ The IAP was greatly concerned about misleading advertising of OTC analgesics:

> Because the consumer needs to be correctly and fully informed, the Panel recommends that the advertising in any medium for these drugs that in any way uses the labeling package or container not be inconsistent, even in subtle implication through mood, focus or innuendo, with the applicable labeling in the OTC internal analgesic monograph.

> The Panel has noted, with concern, certain aspects of commercial advertising of OTC medicines that urge the consumption of these drugs without directing attention to adequate warnings regarding the possible immediate hazards of the use of these products or the potential hazards from their long–term use.

> . . . .

> . . . Therefore, the Panel asks that the proper authority, i. e., the Federal Trade Commission, with the full support and active cooperation of the Food and Drug Administration, more effectively regulate commercial advertising of internal analgesic, antipyretic and antirheumatic preparations on the basis of the labeling recommendations contained in this document. Further, the Panel strongly urges the Federal Trade Commission to require that the cautionary language and warnings developed by the Panel be given

emphasis in commercial advertising more so than is currently being done . . . .

42 Fed.Reg. at 35356. Certainly the Panel would have deplored the commercials considered here, and in particular the two versions of the "Report" commercial, which refer to "this report of medical experts"–the Panel's Report–in promoting a product which the Panel did not approve, in a manner which it did not approve. More importantly, after reviewing the Report, we conclude that the Panel's concerns about the hazards posed to the public health by inadequate OTC drug labeling and misleading or uninformative OTC drug advertising, are well founded. AHP argues that injunctive relief should be denied here because McNeil's products are not labeled in accordance with the Report, and therefore McNeil comes into court with unclean hands. However, when the public health is at issue, the doctrine of clean hands must be judiciously applied. *See Republic Molding Corp. v. B. W. Photo Utilities*, 319 F.2d 347, 350–51 (9th Cir. 1963). A private party who has not acted fairly is not entitled to judicial aid enforcing fair play on the part of another, but the public is. To be sure, McNeil seeks relief out of private motivations, but the relief it seeks will accrue to the general benefit. In such circumstances, a court may, and perhaps must, exercise its authority to see that what law and equity require is done.[27]

### C.

■ Finally, AHP argues that McNeil has failed to prove that the accused commercials injured it or threatened to do so. In the absence of proof of actual or threatened injury, AHP contends, injunctive relief must be denied. In this case, such proof would be difficult since the commercials were aired for a relatively short time. Continued airing would appear to threaten injury, however, since it is difficult to believe that, over the long run, continued

---

**27.** For similar reasons, we reject AHP's argument that injunctive relief is inappropriate because McNeil's television commercials, it is claimed, suffer from defects similar to those that infect AHP's.

AHP has made a number of arguments not directly addressed here, which we have considered but do not find worthy of discussion in an already overlong opinion.

claims of competitive superiority would not eventually detract from a competitor's sales and goodwill. Be that as it may, we conclude that injunctive relief is appropriate. This is so because, as stated by Judge Mansfield in *Syntex Laboratories v. Norwich Pharmacal Co.*, 315 F.Supp. 45, 53 (S.D.N.Y. 1970), *aff'd*, 437 F.2d 566 (2d Cir. 1971), a trademark infringement case:

> Here we are concerned primarily with public health, not profits. The result of confusion could be physical injury to members of the consuming public, whether through simple failure to receive effective medication or through adverse reaction to inadvertently prescribed or dispensed drugs. . . .

> There is thus a public interest in avoiding confusion between plaintiff's and defendant's products above and beyond the economic interest normally present in infringement cases. With the consequences of confusion so much more serious, relief should be granted upon lesser proof of confusing similarity in a prescription drug case than in other areas of infringement litigation. *Morgenstern Chemical v. G. D. Searle & Co.*, 253 F.2d 390 (3d Cir. 1958).

\* \* \* \* \* \*

For the reasons stated, McNeil's motion to amend its complaint is granted, except to the extent that McNeil seeks to add claims relating to the phrase "the pain reliever doctors recommend most." Judgment for McNeil is granted.

Submit judgment and decree on notice.

## ON MOTION FOR RECONSIDERATION

American Home Products Corporations ("AHP") moves pursuant to Rule 9(m) of the General Rules of this Court for reconsideration of that portion of our opinion of July 18, 1980, that granted summary judgment to McNeilab, Inc. ("McNeil") on its claim that the statement in AHP's advertising for Maximum Strength Anacin ("MSA") that MSA "is the maximum strength allowed without prescription" violates Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

Although the motion is untimely because it was not served within ten days of the filing of our opinion, we are nevertheless acting on it because of the importance of the subject matter, and the need to bring some clarity to it, if that is possible. Moreover, it is appropriate to address the motion both because it relies on material not considered in our earlier decision, and because it reveals a misconstruction of the legal standard applicable in this case. We would be delinquent in our duty to present the appellate court with our best considered view of the law, including our view of the new material brought to our attention for the first time on this motion, if we were to dismiss AHP's motion on technical grounds.

### A.

■ AHP's principal contention on this motion is that in our earlier opinion we incorrectly interpreted the "rush–to–market" regulations promulgated by the FDA in connection with the comprehensive review of over–the–counter drug products which the FDA has undertaken pursuant to the Drug Amendments of 1962, Pub.L. No. 87–781, 76 Stat. 780. In that opinion we concluded that in referring to drug products containing "an active ingredient at a dosage level higher than that available in an OTC drug product on December 4, 1975", the regulations, 21 C.F.R. § 330.13, refer only to drug products containing an active ingredient at a dosage level higher than that *legally* available in an OTC drug product on December 4, 1975. In light of the new material AHP has brought to our attention, we agree that our earlier interpretation was erroneous, and that the regulations were intended to refer to drug products containing an active ingredient at a dosage level higher than that *actually* available in an OTC drug product on December 4, 1975. However, we conclude that nevertheless our earlier ruling should stand. In explaining why this is so, we commence with a brief recapitulation of material presented in fuller detail in our earlier opinion.

Pursuant to the Drug Amendments of 1962, the FDA is required to review all OTC drug products on the market to determine which are "generally recognized as safe and effective for their intended use", and therefore exempt from the pre–marketing clearance requirements of the Food, Drug and Cosmetic Act, 21 U.S.C. §§ 301–392. Rather than review OTC drug products one by one, a task that the agency concluded would be unmanageable, if not impossible, the FDA created drug review panels charged with establishing criteria defining the circumstances under which OTC drug products are to be considered "generally recognized as safe and effective for their intended use." The drug panels prepare reports, and as each report is completed it is published in the Federal Register and public comment invited. Eventually, final regulations will be promulgated setting forth the standards with which a drug product must comply to be legally marketed without FDA pre-clearance.

The FDA's "rush–to–market" regulations provided that OTC drug products that contain "an active ingredient at a dosage level higher than that available in an OTC drug product on December 4, 1975" (the date the regulations were first published) may not be marketed without FDA pre–clearance, 21 C.F.R. § 330.13(a), except that following the publication in the Federal Register of an applicable report of a drug review panel, a product that "contains an active ingredient at a dosage level higher than that available in an OTC drug product on December 4, 1975" may be marketed without pre–clearance if it complies with the recommendations of the panel as set forth in the report, and subject to the risk that the FDA may eventually adopt criteria different from those recommended by the panel, requiring recall of the product, id. § 330.13(b). Thus, the regulations create a temporary safe harbor for drug products that comply with a drug review panel's recommendations, expressly authorizing the sale of such products, at least for the time being. In our earlier opinion, we concluded that, contrary to the position taken by AHP, the labeling recommendations of the Internal Analgesics Panel are an essential element of that panel's recommendations, and that therefore, because MSA does not comply with those labeling recommendations, it is not entitled to the protection of the temporary safe harbor created by the "rush–to–market" regulations. Accordingly, we rejected AHP's contention that its marketing of MSA is authorized by the "rush–to–market" regulations, and that it could therefore claim, in its advertising, that MSA was "allowed".

AHP argued, in the alternative, that the "rush–to–market" regulations contain a "grandfather clause" that "expressly permits the marketing of new OTC drugs which are equivalent in dosage levels to those available on December 4, 1975", the date the regulations were promulgated. AHP offered to prove that a product "equivalent in dosage level" to MSA was available on December 4, 1975, that the sale of MSA is accordingly "sanctioned" by the "grandfather clause", and thus that its advertising claim that MSA is "allowed" is valid. In our earlier opinion, we rejected this argument based on our then interpretation of the scope of the regulations. We now recognize that it must be rejected no matter how the regulations are construed, because its premises are false.

As noted above, we ruled in our earlier opinion that the term "available", as used in the regulations meant "legally available" rather than "actually available". AHP has now pointed out that the FDA, in responding at the time the final version of the regulations was published to a comment received regarding a proposed version, addressed the very question considered in our earlier opinion, and rejected the position we adopted:

One comment stated the proposed § 330.13 consistently refers to OTC drug products available on December 4, 1975, or currently available, but that the proposal does not indicate whether mere presence in the marketplace or "legal" presence is necessary to satisfy that requirement. The comment requested clarification of the applicable standard.

The Commissioner intends the terms "currently available" and "available on December 4, 1975" to apply to any drug product that was *in fact* marketed for OTC use on December 4, 1975 . . . .

41 Fed.Reg. 32580, 32582 (August 4, 1976) (emphasis added). In view of this interpretation of the regulations by the agency which promulgated them, our prior reading of the regulations cannot stand.

This determination, however, does not end the matter. It does mean, to be sure, that if as AHP asserts, a product containing 500 mg. of aspirin was available on December 4, 1975, AHP need not rely on the temporary safe harbor of the "rush–to–market" regulations in marketing MSA. It does not necessarily mean that AHP's advertising claim that MSA "is the maximum strength *allowed* without prescription" is not misleading.

As AHP itself argues, and as the authorities on which it relies establish, the FDA has, in addition to creating a temporary safe harbor for products that comply with a drug review panel's recommendation, instituted a moratorium *on regulatory actions* against OTC drug products available on December 4, 1975, and new products of no greater strength, pending completion of the OTC Drug Review. This is reflected in the "rush–to–market" regulations, which by their terms do not apply to such products, but is not, to our knowledge memorialized in any specific regulations. It is to this moratorium that AHP refers when it speaks of a "grandfather clause" to the "rush–to–market" regulations. As we shall see, AHP's terminology is inaccurate, because the moratorium, unlike a true grandfather clause, does *not* create a "safe harbor" for the products covered by it.

The moratorium is an important adjunct to the OTC Drug Review. As noted above, the goal of the Drug Review is to establish criteria defining classes of drug products that are exempt from the Food, Drug and Cosmetic Act's pre–marketing clearance requirements. The purpose of the moratorium on regulatory actions pending completion of the Drug Review is to avoid the

necessity of the FDA's ruling that particular products are or are not exempt from pre–marketing clearance until those criteria have been developed. In addition, the moratorium is intended to conserve the agency's limited resources by minimizing agency litigation involving issues expected to be resolved comprehensively by the Drug Review, and to avoid the unfairness inherent in a product–by–product approach, which inevitably involves regulatory actions against one manufacturer's product while a competing manufacturer's identical product continues to be marketed. *See* Hearings on the Use of Advisory Committees by the Food and Drug Administration Before a Subcommittee of the House Committee on Government Operations (Part II), 94th Cong., 1st Sess. (April 23, May 9, 12, 1975); *cf.* 37 Fed.Reg. 85, 86 (January 5, 1972).

The difficulty with AHP's position is that it confuses the nature of the temporary safe harbor (created by the "rush–to–market" regulations) and that of the moratorium. In creating a safe harbor for certain drug products, the FDA has affirmatively authorized the sale of those products, at least for the moment, in reliance on the conclusions and recommendations of a drug review panel. It is correct to say that the FDA has "allowed" the marketing of such products, even though it has reserved the right to change its mind. The same cannot be said of those products subject to the moratorium. The latter have never been subjected to FDA scrutiny, and the only position that the FDA has taken with respect to them is that it will not take a position until the Drug Review is completed. It follows that although the FDA has not affirmatively disallowed the sale of these products, neither has it "allowed" it.

■ Thus, AHP cannot validly assert in its advertising that MSA is "the maximum strength allowed", even though it would appear that it can market MSA pending completion of the OTC Drug Review without FDA regulatory action. For the reasons stated in our earlier opinion, and summarized above, to the extent that it markets MSA with impunity, it does so because

of the FDA's moratorium on regulatory actions pending completion of the OTC Drug Review, which for the reasons stated in this opinion is no warrant for the advertising claim that MSA is "allowed".

### B.

In its motion for reconsideration, AHP also argues that granting McNeil's motion for summary judgment on the claim that AHP's advertising claim that MSA is "the maximum strength allowed without a prescription" was improper because "the message consumers take away from the challenged advertising is a material question of fact". Memorandum in Support of Defendant American Home Product Corporation's Motion for Reconsideration at 12.

This argument fails because it ignores the fundamental distinction, articulated in *American Brands, Inc. v. R. J. Reynolds Tobacco Co.*, 413 F.Supp. 1352, 1356–57 (S.D.N.Y.1976), and adopted by the Second Circuit in *American Home Products Corp. v. Johnson & Johnson*, 577 F.2d 160 (2d Cir. 1978), between advertising claims that are "literally or grammatically" true, but nonetheless potentially misleading, and advertising claims that are "actually false". In situations involving false claims, it is immaterial what consumers find the message of the advertisements to be, and proof of consumer perception is therefore unnecessary, because it is presumed that false claims "tend to mislead" consumers. As indicated in our earlier opinion and above, the FDA has not affirmatively authorized the sale of products such as MSA, and AHP does not contend that any other entity with authority to regulate such products has done so. Because the statement that MSA "is the maximum strength allowed" is a representation that some appropriate authority has affirmatively approved that strength, we concluded in our earlier opinion that the challenged advertising is "actually false", and therefore that the question of the actual "message consumers take away from the challenged advertising" is not material here. We adhere to this conclusion.

To the extent that this branch of AHP's motion is predicated on a misconstruction of the applicable law, this disposes of it. It is possible, however, that the basis for this branch of the motion is a misunderstanding of our prior ruling on the content of the challenged advertisement, a point that should be clarified. We stated in our earlier opinion that "[t]he representation that MSA is the maximum strength 'allowed' *implies* that an appropriate authority has authorized the sale of MSA or products like MSA" (emphasis added). Our use of the word "implies" was perhaps insufficiently specific. A better way of putting it would be to say that the representation that MSA is the maximum strength "allowed" is a statement which suggests positively that a legally competent authority has affirmatively approved the use of MSA–which is, of course, not the case. However, even if, arguendo, one grants that the phrase "the representation that MSA is the maximum strength 'allowed'" is susceptible of another interpretation, it remains at best an ambiguous statement tending to confuse and the very purpose of the statute is to avoid such ambiguity. Being remedial in nature the statute is to be broadly construed. Clark, C. J. concurring in *Maternally Yours v. Your Maternity Shop*, 234 F.2d 538, 546 (2d Cir. 1956), quoting *L'Aiglon Apparel Inc. v. Lana Lobell Inc.*, 214 F.2d 649 (3d Cir. 1954); *Geisel v. Poynter Products, Inc.*, 283 F.Supp. 261, 267 (S.D.N.Y.1968); *CBS v. Springboard International Records*, 429 F.Supp. 563, 566 (S.D.N.Y.1976) and cases cited therein.

\* \* \* \* \* \*

For the reasons stated above, AHP's motion for reconsideration is granted. On reconsideration, we adhere to our prior decision of July 18, 1980.

It is so ordered.